Rachel C. Strickland
Aaron E. Nathan
James H. Burbage
M. Annie Houghton-Larsen
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
rstrickland@willkie.com
anathan@willkie.com
jburbage@willkie.com
mhoughton-larsen@willkie.com

Michael J. Gottlieb
Meryl Governski (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
mgottlieb@willkie.com
mgovernski@willkie.com

John Langford
Rachel Goodman
UNITED TO PROTECT DEMOCRACY
82 Nassau Street, #601
New York, NY 10038
Telephone: (202) 579-4582
john.langford@protectdemocracy.org
rachel.goodman@protectdemocracy.org

Von A. DuBose (*pro hac vice* forthcoming)
DUBOSE MILLER LLC
75 14th Street NE
Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
dubose@dubosemiller.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RUDOLPH W. GIULIANI<br>a/k/a RUDOLPH WILLIAM GIULIANI,<br><br>　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 23-12055 (SHL) |
| RUBY FREEMAN and WANDREA' ArSHAYE<br>MOSS,<br>　　　　　　　　　Plaintiffs,<br>　　v.<br><br>RUDOLPH W. GIULIANI<br>a/k/a RUDOLPH WILLIAM GIULIANI,<br><br>　　　　　　　　　Defendant. | Adv. Pro. No. 24−01320 (SHL)<br><br>**LOCAL RULE 7056-1(b)**<br>**STATEMENT OF UNDISPUTED**<br>**MATERIAL FACTS IN SUPPORT**<br>**OF PLAINTIFFS' MOTION FOR**<br>**SUMMARY JUDGMENT** |

Pursuant to Local Rule 7056-1(b), Plaintiffs Ruby Freeman and Wandrea' ArShaye Moss ("Plaintiffs"), respectfully submit the following Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

**A.    Background**

1.      On December 23, 2021, Plaintiffs Ruby Freeman and Wandrea' ArShaye Moss filed a civil action in the U.S. District Court for the District of Columbia (the "District Court") against Defendant Rudolph W. Giuliani, Herring Networks, Inc., d/b/a One America News Network, Charles Herring, Robert Herring, and Chanel Rion. *See Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 23, 2021) (the "Freeman Litigation").

2.      All defendants in the Freeman Litigation except for Mr. Giuliani—that is, Herring Networks, Inc., d/b/a One America News Network, Charles Herring, Robert Herring, and Chanel Rion—reached a settlement with Plaintiffs and were dismissed from the case. *See* Declaration of Aaron Nathan in Support of Plaintiffs' Motion for Summary Judgment ("Nathan Decl."), Nathan Decl. Ex. A at 7 (May 11, 2022 Min. Order).

3.      On May 10, 2022, Plaintiffs filed an Amended Complaint. *See* Amended Complaint, *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. May 10, 2022), ECF No. 22 (the "Freeman Complaint"); Nathan Decl. Ex. B.

4.      The Freeman Complaint asserted claims for defamation *per se*, intentional infliction of emotional distress (IIED), and civil conspiracy against the Defendant. Nathan Decl. Ex. B ¶¶ 163–91.

5.      Mr. Giuliani moved to dismiss the Freeman Complaint on June 6, 2022. *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. June 6, 2022), ECF No. 26.

6.      The District Court denied Mr. Giuliani's motion to dismiss the Freeman Complaint on October 31, 2022. *See Freeman v. Giuliani*, No. 21-cv-3354 (BAH), 2022 WL 16551323 (D.D.C. Oct. 31, 2022).

**B.    Mr. Giuliani's Discovery Abuses**

7.      Plaintiffs served their first discovery requests on Mr. Giuliani in May 2022. *See* Memorandum and Opinion Granting Plaintiffs' Motion for Sanctions, *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Aug. 30, 2023), ECF No. 94 (the "Default Judgment"); Nathan Decl. Ex. C at 8–9.

8.      "Between July and November 1, 2022, Giuliani produced to Plaintiffs a total of 193 documents." Nathan Decl. Ex. C at 8 (internal quotations omitted).

9.      "Given the meager number of documents produced over seven months of discovery" Plaintiffs requested, "on December 21, 2022, confirmation from Giuliani's counsel that Giuliani had taken reasonable steps to preserve his electronic evidence." *Id.* at 8–9.

10.     On December 27, 2022, Mr. Giuliani's Counsel responded: "I am not aware of his preservation efforts." *Id.* at 9.

11.     On February 6, 2023, Plaintiffs reiterated their "request that Giuliani's counsel confirm that Giuliani preserved, searched, and produced ESI on his e-mail accounts, devices, social media accounts, messaging applications, or other electronic devices for documents responsive to plaintiffs' Requests for Production." *Id.* (internal quotations omitted).

12.     Plaintiffs "received no response" to their February 6, 2023 request. *Id.*

13.     In his deposition on March 1, 2023, Mr. Giuliani "testified under oath that he used multiple phones, email addresses, and messaging applications in the months following the 2020 presidential election" and he "described his search effort as taking 'a quick look' for responsive materials." *Id.*

14.     However, Mr. Giuliani did not "provid[e] any detail as to whether that 'quick' search was tailored to the instant case." Nathan Decl. Ex. C at 9.

15.     Mr. Giuliani also did not provide any details during his deposition as to whether he had ever "reached out to any of the companies he used for messaging applications to ask that his data be preserved." *Id.* at 9–10.

16.     On March 21, 2023, after Plaintiffs sought court intervention, the District Court held a hearing over "Giuliani's apparent failure to comply with his discovery obligations." *Id.* at 10; *see also* Nathan Decl. Ex. A at 9 (Mar. 16, 2023 Min. Order).

17.     "Given the lack of clarity at the March 21 hearing in responses to queries about what precisely had been preserved, or not, and searched, or not" Mr. Giuliani was directed by the District Court to "(a) submit notice to the Court describing in specific terms the data on the 'TrustPoint' database that were searched in response to Plaintiffs' [RFPs], including date range and contents . . . ; and (b) what locations and data sources remain for searches to be completed to respond fully to plaintiffs RFPs." Nathan Decl. Ex. C at 11; *see also* Nathan Decl. Ex. A at 10 (Mar. 21, 2023 Min. Order).

18.     The District Court also "directed Giuliani to complete searches and production of responsive records to Plaintiffs' RFPs." Nathan Decl. Ex. C at 12 (internal quotations omitted); *see also* Nathan Decl. Ex. A at 10 (Mar. 21, 2023 Min. Order).

19.     On March 24, 2023, Mr. Giuliani filed "a two-page 'report' . . . which did not describe in specific terms the data sources located on TrustPoint or what locations and data sources remained to be searched." Nathan Decl. Ex. C at 11; *see also Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Mar. 24, 2023), ECF No. 40.

20.     On April 10, 2023, Plaintiffs and Mr. Giuliani filed a joint status report, "in which plaintiffs explained that 'the Parties are at an impasse' with respect to 'Giuliani's productions to date' and requested leave to file a motion to compel." Nathan Decl. Ex. C at 12; *see also Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Apr. 10, 2023), ECF No. 42.

21.      On April 11, 2023, the District Court granted Plaintiffs leave to file a motion to compel. Nathan Decl. Ex. C at 12; *see also* Nathan Decl. Ex. A at 11 (Apr. 11, 2023 Min. Order)*.

22.     On April 17, 2023, Plaintiffs filed a Motion to Compel Mr. Giuliani "to produce or justify the withholding of all materials in his possession, custody, or control responsive to Plaintiffs' requests for production, provide a sworn declaration regarding the preservation efforts he has taken, all locations and data that he used to communicate about relevant topics, the specific 'data' that is housed in [TrustPoint], and the searches he has conducted to locate responsive documents." Nathan Decl. Ex. C at 13 (internal quotations omitted and cleaned up); *see also Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Apr. 17 2023), ECF No. 44; Nathan Decl. Ex. D.

23.     In his response to Plaintiffs' Motion to Compel Mr. Giuliani "claimed that any further searches of the TrustPoint dataset would not be possible because those 'documents have now been archived.'" Nathan Decl. Ex. C at 14; *see also Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. May 1, 2023), ECF No. 51-1 ¶ 5.

24.     Mr. Giuliani further stated that he did "not have funds to pay . . . at this time" to regain access to the TrustPoint Database. *See* Nathan Decl. Ex. C at 13–14; *see also Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. May 1, 2023), ECF No. 51-1 ¶ 5.

25.     On May 19, 2023, the District Court held a discovery hearing on Plaintiffs' Motion to Compel, during which Mr. Giuliani "acknowledged his obligation to preserve documents related

to this litigation and that this obligation arose before plaintiffs filed this action, stating, 'I have been doing this for 50 years; I understand the obligations.'"  Nathan Decl. Ex. C at 14.

26.    At the same May 19, 2023 hearing, the District Court asked Mr. Giuliani "for the steps taken to preserve electronic evidence" and Mr. Giuliani's counsel responded that Mr. Giuliani "has not deleted any documents."  The District Court explained to Mr. Giuliani that "not deleting documents is not the same as preserving the information in a manner than can be retrieved and searched." *Id.* at 14.

27.    On May 19, 2023, following the Motion to Compel discovery hearing, the District Court partially granted Plaintiffs' Motion to Compel and reserved ruling on the remainder. *See id.* at 14–15.

28.    On the same date, the District Court ordered that "[b]y May 30, 2023 in order to evaluate defendant's claim of an inability to afford the cost of access to, and search of, the TrustPoint dataset . . . the defendant is DIRECTED to produce to plaintiffs: . . . full and complete responses to plaintiffs' requests for financial information in RFP Nos. 40 and 41[.]" Nathan Decl. Ex. A at 14 (May 19, 2023 Min. Order) (emphasis in original); *see also* Nathan Decl. Ex. C at 15.

29.    Mr. Giuliani did not comply, with the District Court later finding that Mr. Giuliani failed to "produce fulsome responses to plaintiffs' RFPs. 40 and 41 regarding his financial records." *See* Nathan Decl. Ex. C at 40–41 (internal quotations omitted).

30.    On June 22, 2023, Plaintiffs filed a Motion to Compel Giuliani Partners LLC and Giuliani Communications LLC (collectively, "Giuliani Businesses"), after neither Giuliani Business replied to "properly noticed and served subpoenas for records and testimony."  *See id.* at 20–21; *see also Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. June 22, 2023), ECF. No. 70.

31.     Neither Giuliani Business replied to Plaintiffs' Motion to Compel them. *See* Nathan Decl. Ex. C at 21; *see also* Nathan Decl. Ex. A at  (July 13, 2023 Min. Order).

32.     On June 23, 2023, the District Court ultimately granted Plaintiffs' Motion to Compel Mr. Giuliani "[i]n nearly all respects," including granting Plaintiffs' request for attorneys' fees and costs. *See* Nathan Decl. Ex. C at 18; *see also* Nathan Decl. Ex. A at  (June 23, 2023 Min. Order).

33.     The District Court found that "[d]espite Giuliani's 50 years of experience as an attorney" he continued to "repeatedly flaunt[] his discovery obligations" and "ignor[e] court orders." *See id.* Nathan Decl. Ex. C at 45–46.

34.     Given "Giuliani's deficient discovery compliance," Plaintiffs filed a Motion for Sanctions under Federal Rule of Civil Procedure 37 on July 11, 2023. (the "Motion for Sanctions"). *See id.* at 23–24; *see also Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. July 11, 2023), ECF No 81, Nathan Decl. Ex. E.

35.     On July 13, 2023, two days after Plaintiffs filed the Motion for Sanctions, the District Court entered a Minute Order concerning Mr. Giuliani's "generally undisputed continuing discovery failures."  *See* Nathan Decl. Ex. C at 19; *see also* Nathan Decl. Ex. A at 23–24 (July 13, 2023 Min. Order).

36.     In that Minute Order, the District Court "cautioned" that Mr. Giuliani's continued "failure to comply" with the District Court's orders "may result in severe discovery sanctions" including "default judgment and contempt of court." *See* Nathan Decl. Ex. C at 19; *see also* Nathan Decl. Ex. A at 23–24 (July 13, 2023 Min. Order).

37. The same day, the District Court ordered Mr. Giuliani to reimburse the Plaintiffs for $89,172.50 in attorneys' fees incurred in preparing the Motion to Compel. *See* Nathan Decl. Ex. C at 18–19;  Nathan Decl. Ex. A at 23–24 (July 13, 2023 Min. Order).

38. The District Court further directed Mr. Giuliani to show cause why the Motion to Compel the Giuliani Businesses should not be granted as conceded given his prior declaration that "he was the sole owner of the Businesses."  *See* Nathan Decl. Ex. C at 21; *see also Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. June 26, 2023), ECF No. 73 ¶¶ 2–3.

**C.      The District Court Enters Default Judgment on Liability as a Sanction for Defendant Giuliani's Willful Discovery Misconduct.**

39. On August 30, 2023, and in light of Mr. Giuliani's "willful shirking of his discovery obligations" the Court entered default judgment against him, "holding him civilly liable on plaintiffs' defamation, intentional infliction of emotional distress, civil conspiracy, and punitive damage claims[.]"  *See* Nathan Decl. Ex. C at 5.

40. When entering the default judgment against Mr. Giuliani, the District Court noted that default judgment is not appropriate unless "the litigant's misconduct is accompanied by 'willfulness, bad faith, or fault.'" *See id.* at 44.

41. In its opinion, the District Court made extensive and specific factual findings and legal determinations that established Mr. Giuliani's pattern of "willful discovery misconduct" satisfied the legal standard for default judgment.  *See id.* at 4–5.

42. The District Court recounted how Mr. Giuliani "repeatedly flaunted his discovery obligations," creating a "murky mess" out of the process. *See id.* at 5, 45

43. The District Court found that Mr. Giuliani's "willful shirking" of his discovery obligations "significantly prejudiced plaintiffs' abilities to prove their claims because

circumstantial evidence of Giuliani's knowledge of the falsity of his claims concerning plaintiffs likely would have existed in his lost ESI." *See id.* at 5, 38.

44.     The Court found that "Giuliani's most flagrant violation of this Court's Discovery Orders is that he has not, as required by the May 31 Order, searched and produced all materials responsive to plaintiffs' RFPs . . . within the date ranges agreed to by the parties[.]" *See id.* at 40–41.

45.     The District Court highlighted that "[w]ith respect to the May 31 Order, Giuliani was given reprieve after reprieve to comply with the Order," including a "two-week extension to comply" and then "another 35 days to comply" but he ultimately made the "choice to make no effort to comply with the May 31 Order[.]" *See* Nathan Decl. Ex. C at 45–46.

46.     The District Court found that Mr. "Giuliani ***did not contest*** these discovery shortcomings and failures to comply with the Discovery Orders." *See id.* at 19 (emphasis added).

47.     Rather, the Court found that Mr. Giuliani's Nolo Contendre stipulations filed on July 25, 2023 and August 8, 2023, in which he conceded "for purposes of [the] litigation, liability on the factual elements of plaintiffs' claims and their entitlement to punitive damages" "ma[d]e crystal clear ***his choice*** not to provide further discovery" and "ma[d]e clear his goal to bypass . . . a merits trial."  *See* Nathan Decl. Ex. C at 4–5, 26 (emphasis added); *see also generally Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. July 25, 2023), ECF No. 84-2; Nathan Decl. Ex. F; *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Aug. 8, 2023), ECF No. 90 Nathan Decl. Ex. G.

48.     The District Court concluded that "the only reasonable explanation for Giuliani's blatant disregard for satisfying his preservation obligations—despite fully understanding them—is that he ***intentionally and willfully*** ignored them." *See* Nathan Decl. Ex. C at 39–40.

49.     The District Court found that Mr. Giuliani's misconduct "can be seen as nothing else than ignoring court orders." *See id.* at 45–46.

50.     In addition to entering default judgment, the District Court gave Mr. Giuliani and his businesses one last opportunity to produce "records relevant to the quantifications of damages that they were required, but still have failed, to produce" including "financial documents and viewership metrics." *See id.* at 6, 56.

51.     The District Court underscored that the failure to produce such materials by September 20, 2023 would lead to adverse inferences. *See id.* at 6.

52.     The District Court further ordered Mr. Giuliani to "ensure the Giuliani Businesses reimburse plaintiffs' attorneys fees associated with their successful motion to compel discovery from the [Giuliani] Businesses, in the amount totaling $43,684." *See id.* at 7.

53.     On September 20, 2023, following a proposed pretrial and trial schedule submission from Mr. Giuliani and Plaintiffs, the District Court scheduled a damages-only trial to begin on December 11, 2023.  Nathan Decl. Ex. A at 28 (Sep. 20, 2023 Min. Order).

54.     On September 22, 2023, the District Court ordered Mr. Giuliani, once again, to pay the $89,172.50 in outstanding attorneys' fees awards from Plaintiffs' Motion to Compel the Defendant and the Motion to Compel the Giuliani Businesses. *Id* at 28.

55.     The Court further ordered that Mr. Giuliani reimburse the Plaintiffs for the $104,256.50 incurred in filing the Plaintiffs Motion for Sanctions. *Id.*

56.     Subsequently, Mr. Giuliani failed to produce records relevant to the quantification of damages as ordered by the District Court on August 30, 2023, leading Plaintiffs to file a Motion for Additional Sanctions on September 29, 2023.  *See Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Sep. 29, 2023), ECF No. 101.

57.     On October 13, 2023, following Mr. Giuliani's "continued and flagrant disregard of [the District Court's] August 30 Order that he produce financial-related documents . . . viewership metrics, and social media reach, all of which information is potentially pertinent at the upcoming damages trial," the District Court imposed additional sanctions, including but not limited to the following mandatory adverse inferences against Mr. Giuliani:

- "defendant Giuliani was intentionally trying to hide relevant discovery about the Giuliani Businesses' finances for the purpose of shielding his assets from discovery and artificially deflating his net worth[;]"

- "defendant Giuliani was intentionally trying to hide relevant discovery about the viewership of [his programs containing defamatory statements] and his social media reach for the purpose of artificially deflating the reach of his defamatory statements[;]"

- "defendant Giuliani received substantial financial benefits from defendant Giuliani's defamation of Plaintiffs[;]" and

- "the Giuliani Businesses continue to generate advertising revenue and other income from their operations[.]"

*See Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Oct. 13, 2023), ECF No. 102, at 4; Nathan Decl. Ex. H at 4.

**D.    The Default Judgment Deems Admitted All of the Facts Alleged in the Freeman Complaint.**

58.     By virtue of the default judgment, all of the facts alleged in the Amended Complaint were deemed admitted. Those facts include the following:

59.     During the 2020 general election, Ms. Moss worked for the Fulton County Registration and Elections Department as a part of its absentee ballot processing operation. *See* Nathan Decl. Ex. B ¶¶ 20, 31.

60.     Ms. Moss began working for the Department in 2012 and tabulated ballots in every election in the county between 2012 and 2020. *See id.* ¶¶ 20, 31.

61.     In November 2020, Ms. Moss worked at State Farm Arena, a local sports venue that the Fulton County Board of Elections and Registrations used as a ballot tabulating center for the 2020 general election. *Id.* ¶¶ 30–31.

62.     Ms. Moss tabulated absentee ballots alongside her mother, Ms. Freeman, who signed up to serve as a temporary election worker for the general election. *Id.* ¶¶ 19–20, 31–32.

63.     Ms. Moss and Ms. Freeman's responsibilities included preparing absentee ballots for counting and processing. *Id.* ¶¶ 2, 19–20, 31.

64.     The events of Election Day, November 3, 2020, at State Farm Arena are well documented, as a result of multiple investigations into Mr. Giuliani's false claims about Ms. Freeman and Ms. Moss.  *Id.* ¶¶ 52–54.

65.     The table below catalogs the day's events. Nathan Decl. Ex. B ¶ 54.

| | |
|---|---|
| 5:22 AM | Election workers start to arrive at State Farm Arena and find standing water and a leak in the ceiling of the ballot processing room. Workers immediately move ballots and tables away from the area to prevent any water damage. *Id.* |
| 6:30 AM | People move tables and ballot boxes as needed for cleaning, but do not tamper with ballots. *Id.* |
| 7:11 AM | People continue to clean up the water and bring in vacuums and a Zamboni-like machine to begin drying the carpet. *Id.* |
| 8:22 AM | People, including election workers, help rearrange the room into the original layout.  They move tables and ballot containers, including the table under which "suitcases" of ballots were allegedly stashed.  The video shows nothing is hidden under the table. *Id.* |
| 9:00 AM | Election workers prepare to process ballots after the cleaning process is complete. No ballots were damaged by the leak. *Id.* ¶¶ 53–54. |
| 9:57 PM | A group of election workers responsible for opening envelopes leave and prepare to stop work for the night.  While media and election observers are in the room, workers begin packing up opened, but uncounted ballots, and storing them in black ballot boxes under tables. Nathan Decl. Ex. B ¶¶ 47, 54. |
| 10:06 PM | Poll workers store the containers with uncounted ballots under the table for the night while there are still many people in the room. *Id.* ¶ 54. |

| 10:15 PM - 10:20 PM | Two groups of poll workers are still in the room, the workers responsible for opening envelopes and the workers responsible for scanning ballots. *Id.* ¶ 44. |
| ~10:30 PM | The workers responsible for cutting open envelopes stopped working for the night and left. Observers and members of the press begin to leave shortly thereafter. Workers responsible for scanning remain in the room. *Id.* ¶¶ 43, 45, 47, 52. |
| 11:02 PM | At the direction of the Secretary of State, election workers unpack the stored ballots and resume counting. *Id.* ¶¶ 44, 54. |

66.     By November 13, 2020, NBC, ABC, CBS, and CNN projected that President Joe Biden won the Presidential Election in Georgia.  Fox News and the Associated Press made the same projection on November 19, 2020. *Id.* ¶ 33.

67.     Between November 11 through 19, 2020, Georgian election officials conducted a risk-limiting audit, consisting of a "hand-sorting and counting each ballot[.]" The audit was the "largest hand count of ballots in United States history" and concluded "the correct winner was reported." Nathan Decl. Ex. B ¶¶ 34.

68.     On November 20, 2020, following the audit, Georgia Governor Brian Kemp and Georgia Secretary of State Brad Raffensperger certified President Biden's victory following the audit. *Id.* ¶ 35.

69.     Former-President Trump requested a third count of the ballots in Georgia, which, again confirmed President Biden's victory on December 7, 2020. *Id.* ¶ 36.

70.     In the days following the 2020 Election, Mr. Giuliani became a "key figure in orchestrating and disseminating the conspiracy theory that the 2020 election was 'stolen' from Trump by now-President Joseph R. Biden, Jr. through coordinated large-scale election fraud across key swing states, including Georgia." *Id.* ¶¶ 5, 129.

71.     As a part of this effort, Mr. Giuliani assembled a team, which included Jenna Lynn Ellis, Bernard Kerik, Christina Bobb, Katherine Friess, Boris Epshteyn, Phil Waldron, and other

lawyers and individuals who worked alongside Mr. Giuliani in support of the Trump Campaign. (the "Giuliani Legal Team"). *Id.* ¶ 5.[1]

72.     Mr. Giuliani coordinated a campaign to convince state and federal legislators and the public at large that Democrats engaged in large-scale election fraud schemes in Georgia and other key swing states. Nathan Decl. Ex. B ¶¶ 5, 132.

73.     On December 1, 2020, Gabriel Sterling, the then-Georgia Voting Implementation Manager, commented on the ongoing efforts to undercut the election results in Georgia. Mr. Sterling warned if sensational election fraud claims continued, "[s]omeone's going to get hurt, someone's going to get shot, someone's going to get killed." *Id.* ¶ 138.

74.     "Defendant Giuliani pressed forward in spite of that and other warnings and, in doing so, directly contributed to Ms. Freeman and Ms. Moss receiving—almost immediately—an onslaught of extremely violent and graphic threats and dangerous harassment." *Id.* ¶ 139.

75.     Around December 2020, Mr. Giuliani and his team memorialized this campaign in written form in a document titled the "Strategic Communications Plan," credited to the "Giuliani Presidential Legal Defense Team" (the "Giuliani Strategic Plan"). *Id.* ¶¶ 57–64, 165.

76.     The Giuliani Strategic Plan was orchestrated by Mr. Giuliani, as an attempt to further the Trump Campaign's private political goals. *Id.* ¶¶ 57–58.

---

[1] The District Court found that the members of the civil conspiracy to defame included members of the "Trump Legal team, headed by Giuliani . . . as identified in plaintiffs' Amended Complaint, through deposition testimony, or expert reports disclosed to Giuliani prior to the entry of default judgment on August 30, 2023." *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 7, 2023), ECF No. 119 at 11–12; Nathan Decl. Ex. O at 11–12. The District Court further cataloged deposition testimony on the identities of members of the "Trump Campaign Legal team that Giuliani admits heading," which names all of the individuals cited in ¶ 71 above. Nathan Decl. Ex. O at 9–10, n.1.

77.    The Giuliani Strategic Plan's stated goal was to launch a "Nationwide communications outreach campaign to educate the public on the fraud numbers, and inspire citizens to call upon legislators and Members of Congress to disregard the fraudulent vote count and certify the duly-elected President Trump." *Id.* ¶ 58.

78.    What Giuliani ultimately did was "orchestrate[] a sustained smear campaign" against Ms. Freeman and Ms. Moss, "repeatedly accusing Ms. Freeman and Ms. Moss, by name, on television and on the Internet and social media networks of committing election fraud[.]" Nathan Decl. Ex. B ¶ 4.

79.    In line with Mr. Giuliani's strategy, Trump Campaign surrogates appeared before a committee of the Georgia State Senate on December 3, 2020, alleging that election fraud tainted the results of November 3, 2020 Election in Georgia. *Id.* ¶¶ 5, 37.

80.    During that hearing, a Trump Campaign surrogate played snippets of security footage from State Farm Arena on November 3, 2020, claiming that it depicted election workers, including Ms. Freeman and Ms. Moss, committing election fraud. *Id.*  ¶ 38.

81.    Within mere hours, the Trump Campaign and Mr. Giuliani published the clips of footage (the "State Farm Arena Video") on Twitter,[2] claiming it showed "suitcases filled with ballots pulled from under a table AFTER supervisors told poll workers to leave room and 4 people stayed behind to keep counting votes."  *Id.* ¶ 39.

82.    The same day, Mr. Giuliani declared on Twitter that the "video tape doesn't lie. **Fulton County Democrats stole the election**. It's now **beyond doubt**. Go to the tape!" *Id.* ¶ 39, n.23 (emphasis added).

---

[2] For purposes of this Rule 56.1 Statement, the social media platform now known as X is referred to as Twitter, its formers name.

83.     Based on the State Farm Arena Video and little else, Mr. Giuliani began accusing

Ms. Freeman and Ms. Moss of engaging in various forms of election fraud, including:

- "engaging in a criminal conspiracy, along with others, to illegally exclude observers during the counting of ballots 'under false pretenses' so that they could engage in election fraud;

- criminally and/or fraudulently introducing 'suitcases' of illegal ballots into the ballot-counting process;

- criminally and/or fraudulently counting the same ballots multiple times in order to swing the results of the election;

- surreptitiously passing around flash drives that were not supposed to be placed in Dominion voting machines; and

- committing other crimes, including participating in something that amounted to the 'crime of the century.'"

*Id.* ¶ 4; *see also id.* ¶¶ 59–60, 62–63 66, 69, 71–72, 74, 89–91, 94, 96, 99–100, 134, 166; *Freeman*

*v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 7, 2023), ECF No. 120 at 2; Nathan Decl. Ex. I at 2.

84.     Mr. Giuliani "launched the Strategic Campaign" and added his claims about Ms.

Freeman and Ms. Moss to the Giuliani Strategic Plan's talking points as the perpetrators of fraud

in Georgia, Nathan Decl. Ex. B ¶¶ 9–10, 12, 65, 165, including:

- "Election Official Ruby Freeman is seen surreptitiously & illegally handing off hard-drives ON CAMERA in the Georgia counting facility;" *Id.* ¶ 60.

- "Video of Ruby and Shay [sic] at midnight

  o That is the time of the 200,000 vote bump

    ▪ Similar interruptions at same time in other states

  o No Watermain Break – a lie to get the Republican observers and media to leave at 10:30pm" *Id.* ¶ 62.

- "**'Suitcase Gate'** – Video of ballot stuffing when suitcases (container type) filled with ballots (approximately 6,000 in each container) were rolled out from under table at GA arena and placed in tabulation machines (one batch repeatedly tabulated at least 3 times) by [X number] of poll workers who remained AFTER all Poll Watchers (GOP and the like), press and all third parties were required to leave the premises per announcement at

or about [__ AM] until [__ AM] in violation of election laws enacted by GA state legislature. Ruby Freeman (woman in purple shirt on video), now under arrest and providing evidence against GA SOS Stacey Abrams and DNC on advanced coordinated effort to commit voter / election fraud [*need confirmation of arrest and evidence*]." *Id.* ¶ 63.

85.    "There is not, and has never been, any basis for [the] statements" in the Giuliani Strategic Plan or the similar statements Mr. Giuliani made about Ms. Freeman and Ms. Moss. *Id.* ¶ 13.

86.    The State Farm Arena Video did not show ballots being hidden in suitcases, election observers being improperly excluded, or ballots being counted multiple times, but rather "[s]hows normal ballot processing." *Id.* at ¶ 41; *see also id.* ¶¶ 40–52.

87.    Further, as the multiple *hand* recounts confirmed, ballots were not scanned multiple times to inflate the vote count and the results of the election were not artificially changed by software, from flash drives or otherwise. *Id.* ¶¶ 10, 13, 40–52, 54.

88.    "Within 24 hours of the original publication by Defendant Giuliani . . . of the lies on December 3, 2020 Georgia election official had publicly and definitively debunked the claims about Ms. Freeman and Ms. Moss." Nathan Decl. Ex. B ¶ 7; *see also id.* ¶¶ 40–45.

89.    At 5:41 AM on December 4, 2020, the day after the State Farm Arena Video was released, Mr. Sterling began publicly refuting Mr. Giuliani's claims. In the early hours of the morning, Mr. Sterling announced on Twitter that the "90 second video of election workers at State Farm arena, purporting to show fraud was watched in its entirety (hours) by @GaSecofState investigators. Shows normal ballot processing." *Id.* ¶ 41.

90.    Later the same day, Mr. Sterling appeared in a television Newsmax segment where he detailed how the State Farm Arena Video did not depict anything Mr. Giuliani claimed. Mr. Sterling explained:

- "***Unlike watching 90 seconds*** of it like we saw in the Senate hearing yesterday, ***we've had our investigators watch all many several hours of it yesterday.***" *Id.* ¶ 44 (emphasis added).

- "I've been in this room [at State Farm Arena]. It's really obvious there's video cameras everywhere, so ***they know they're being watched on that front.***" *Id.* (emphasis added).

- "And what essentially happened is—and we knew about this, part of this, on election night itself—around 10:15/10:20, there's two groups of people in this room that are working. There are cutters—the people who are opening the envelopes—and then there's the people who are scanning, which is the ones we see on the video. . . . So what happened was, when the cutters were—they were, once they were done, they were, they was like, 'Okay, we're done, time to go home,' and the media started packing up. And then the monitors kept packing up." *Id.*

- "But when you watch the video, the process—***those aren't suitcases. Those are regular absentee carriers used in dozens of counties across the state***. That's how they bring those in. ***Nothing was brought in without the monitors there***, so everything was there. ***There was nothing new brought in***. We didn't see somebody wheeling stuff into the room; ***we saw stuff that was already in the room that the monitors already saw brought in.***" *Id.* (emphasis added).

91.     Mr. Sterling also echoed the warning he made before Mr. Giuliani published the State Farm Arena Video, saying, "when people whip people's emotions up, it goes back to the issue I was talking about before of threats being against these thousands of workers across the country." *Id.*

92.     On December 6, Georgia Governor Brian Kemp publicly filed a declaration from the chief investigator for the Georgia Secretary of State, France Watson, in *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga.), a lawsuit challenging the results of the election.  Nathan Decl. Ex. B  ¶ 47.

93.     In the declaration, Ms. Watson detailed the official investigation into the State Farm Arena Video, which included interviewing witnesses and reviewing all the security footage from State Farm Arena on Election Day. *Id.*

94.     The investigation concluded that "observers and members of the press were *not* told to leave," rather, observers and press chose to leave after seeing some election workers exit. *Id.* (emphasis in the original).

95.     Ms. Watson also confirmed Mr. Sterling's statement that no ballots were brought in from an outside or unknown location. *Id.* ¶¶ 47, n.32.

96.     The press widely reported on Ms. Watson's declaration. *Id.* ¶ 48.

97.     On December 7, 2020, Georgia Secretary of State Brad Raffensperger and Mr. Sterling held a press conference, announcing that Georgia was yet again re-certifying President Biden's victory in the state. Mr. Sterling went on to again refute the claims about the State Farm Arena Video depicting any form of election fraud. *Id.* ¶ 49.

98.     Mr. Sterling spelled out that the multiple hand recounts Georgia officials conducted would have detected if ballots at State Farm Arena were counted multiple times. Nathan Decl. Ex. B ¶¶ 49–50.

99.     Mr. Sterling further described the ever-evolving fraud claims surrounding the State Farm Arena Video as a "ridiculous game of whack-a-mole." *Id.* ¶ 50.

100.     The press widely reported on the press conference and Mr. Sterling's remarks. *Id.* ¶ 51.

101.     "Despite knowing that the Georgia election officials had refuted the allegations of wrongdoing, Defendant Giuliani chose to deliberately disregard the truth and instead to use the Trump Edited Video to continue to fabricate and publish lies about Ms. Freeman and Ms. Moss." *Id.* ¶ 8; *see also id.* ¶¶ 53, 56, 103–104.

102.     Throughout the entire smear campaign, Mr. Giuliani "continued to consciously avoid the truth and had no credible basis for the allegations he continued to make." *Id.* ¶ 112.

103.   Mr. Giuliani and the Giuliani Legal Team did not have contravening evidence of election fraud at State Farm Arena.  *Id.* ¶¶ 128–131, 133.

104.   "[A]t no point in publishing his false statements about Ms. Freeman and Ms. Moss did Defendant Giuliani attempt to contact Plaintiffs to obtain their account of the events being reports.  Nor did Defendant Giuliani contact for corroboration other obvious available sources, and he specifically avoided contacting sources who had evidence to disprove [the] lies."  Nathan Decl. Ex B ¶ 128.

105.   For example, the Giuliani Strategic Plan recognizes that Mr. Giuliani and his team still "need[ed] confirmation of [Ms. Freeman's] arrest and evidence." *Id.* ¶ 10.

106.   Undeterred by the truth, Mr. Giuliani continued to make false statements about Ms. Freeman and Ms. Moss that were designed to further the election fraud narrative. *Id.* ¶¶ 3, 8, 12, 112, 129, 131.

107.   A full list of the Actionable Statements at issue in the Freeman Litigation can be viewed in Exhibit J of the Nathan Declaration.[3]

108.   Mr. Giuliani and his co-conspirators studiously "amplified his defamatory statements by publishing them on a variety of channels, including on television and social media," which included the "Channels to Disseminate Messaging" identified in the Giuliani Strategic Plan. Nathan Decl. Ex B  ¶¶ 11–12 (cleaned up).

109.   As "Giuliani's Strategic Plan listed," Mr. Giuliani disseminated false and malicious statements about Ms. Freeman and Ms. Moss using "Presidential Tweets, Giuliani Team Tweets,

---

[3] The chart of Actionable Statements includes all of the statements made by Mr. Giuliani and his co-conspirators that were identified in the Freeman Complaint and the expert reports of Dr. Ashley Humphreys. *See also* Nathan Decl. Ex. O at 14–16  (finding Mr. Giuliani is liable for damages resulting from all of the statements from Mr. Giuliani and his co-conspirators that are identified in the Amended Complaint and Expert Report of Dr. Ashlee Humphreys).

Talk Radio, Conservative Bloggers, YouTube Influencers, and Social Media Influencers." *Id.* ¶¶
11–12 (cleaned up).

110.   At the time of the 2020 general election, Mr. Giuliani had become a podcast and
radio show host and a pundit on other media channels.  *Id.* ¶¶ 21, 116.

111.   In 2020 he hosted multiple programs, including a daily radio show on WABC 77
titled *Chat with the Mayor*, a weekly Sunday radio show on WABC77 titled *Uncovering the Truth
with Rudy Giuliani and Dr. Maria Ryan*, and an online video show posted on multiple platforms
titled *Rudy Giuliani's Common Sense*. *See id.* ¶ 116.

112.   Mr. Giuliani published his sensational and completely false claims about Ms.
Freeman and Ms. Moss on his own social media, his radio shows, his video podcast, and his
appearances on other radio and television programs. *Id.* ¶¶ 4, 12, 66–76, 89–101, 130–131, 165.
*See generally* Nathan Decl. Ex. O at 12–16.

113.   Mr. Giuliani "advanced this predetermined fictitious storyline in the face of the
facts because he believed it to be personally advantageous to do so. He was motivated to publish
lies about Plaintiffs because lying about the election results was more profitable than reporting the
truth."  Nathan Decl. Ex. B ¶ 130.

114.   Mr. Giuliani "consciously avoided the truth in order to increase his profile and to
profit from the repeated publication of scandalous material. Defendant's publications about voter
fraud throughout the 2020 election cycle increased his media reach and engagement. His
broadcasts about voter fraud, in particular, performed well, and, on information and belief, he
earned increased advertising revenue by publishing and republishing such well-performing
falsehoods about Plaintiffs."  *Id.* ¶ 131.

115.   Mr. Giuliani "additionally hoped that repeating his preconceived narrative would have the effect of overturning the outcome of the presidential election. In particular, Defendant directed his media appearances to state and federal legislators within and without the District of Columbia, as well as their constituents, and to state and federal officials within and without the District with the goal of pressuring those legislators and officials to act unlawfully to refuse to certify electors for President-elect Biden, de-certify electors for President-elect Biden, unlawfully certify electors for Trump, recognize only those electors for Trump, and/or to refuse to recognize electors for President-elect Biden." *Id.* ¶ 132.

116.   Just "[a]s he carefully planned," Mr. Giuliani "repeatedly defamed Plaintiffs across multiple widely viewed media platforms." *Id.* ¶ 65.

117.   Mr. Giuliani's "character assassination of Ms. Freeman and Ms. Moss was deliberate." *Id.* ¶ 9.

118.   Each statement published about Ms. Freeman and/or Ms. Moss "was published with actual malice." *Id.* ¶ 169.

119.   Mr. Giuliani had "no concern for the truth, or for the real-life consequences of his willful lies" where he "falsely and baselessly portrayed Plaintiffs as traitors[.]"  Nathan Decl. Ex. B ¶ 12.

120.   In inflicting defamation damages on Plaintiffs, Mr. Giuliani "acted with willful misconduct, malice, fraud, wantonness, oppression, . . . and he ***specifically intended*** to cause Ms. Freeman and Ms. Moss harm."  *Id.* ¶ 175 (emphasis added).

121.   "As a reasonably foreseeable—and intended—result of Defendant's statements and actions, others repeated and amplified these false and defamatory statements." *Id.* ¶ 165.

122.    In fact, Mr. Giuliani "encouraged those listening [on television and social media] to watch and spread the defamatory clips repeatedly.  As intended, numerous third-party publishers republished Giuliani's false accusations to millions of viewers and readers, identifying Ms. Freeman and Ms. Moss by name . . . and leveling additional false and malicious accusations of criminal election fraud against them." *Id.* ¶ 12.

123.    Ms. Freeman and Ms. Moss were bombarded with calls and messages across multiple platforms. They received messages accusing them of "treason" and suggesting the women should be killed for their crimes. *Id.* ¶¶ 14, 16, 139, 143, 148, 151–53.

124.    For months, Ms. Freeman and Ms. Moss received dozens of harassing phone calls, including calls received by Ms. Moss' then-fourteen year old son, who used Ms. Moss' old phone. *Id.* ¶¶ 140, 151–152. Callers inundated him with threats of violence and racial slurs, with one caller stating he "should hang alongside [his] n***** momma." *Id.* ¶ 151.

125.    To demonstrate that they knew where they lived, strangers sent Ms. Freeman and her mother pizzas that they never ordered. Ms. Freeman received Christmas cards in the mail, telling her "You deserve to go to jail, you worthless piece of sh*t wh***." Nathan Decl. Ex. B ¶ 142–143.

126.    Not content to act from a distance, strangers began to harass and taunt Ms. Freeman and Ms. Moss in person. Strangers showed up at Ms. Freeman's home and harassed her neighbors when she did not answer. *Id.* ¶ 141.

127.    Unknown individuals went to the home of Ms. Freeman's mother, Ms. Moss' grandmother, and banged on the door while shouting that they were there to conduct a "citizens' arrest." *Id.* ¶¶ 15, 155. Strangers even picketed outside Ms. Moss' office at the Fulton County Department of Elections, demanding that she be terminated. *Id.* ¶ 157.

128.    In the days before the January 6 Capitol insurrection, Ms. Freeman vacated her home on the advice of the Federal Bureau of Investigation, narrowly avoiding a dozen people who assembled outside her residence with flags and bullhorns. *Id.* ¶¶ 15, 144–45.

129.    To this day, Ms. Freeman fears being recognized in public and using her own name. The harassment forced Ms. Freeman to abandon her professional moniker "Lady Ruby" and the name of her long-running boutique "LaRuby's Unique Treasures." *Id.* ¶¶ 147–49.

130.    Mr. Giuliani's campaign of lies ultimately forced Ms. Moss to leave her career with Fulton County elections, after the workplace grew toxic and her closest colleagues were warned to "watch the company they keep." *Id.* ¶¶ 156–159.

131.    The harassment took a mental and emotional toll on both women. Ms. Moss suffered from disruptive sleep and immense anxiety. She isolated herself from friends and society because of the constant fear that unknown people will act on their threats and end her life. Nathan Decl. Ex. B ¶¶ 160–162.

132.    As the Defendant and Plaintiffs stipulated in the Revised Pretrial Submission, Ms. Freeman and Ms. Moss suffered financial damage as well. *See Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 4, 2023), ECF No. 115 at 20.

133.    Mr. Giuliani's conduct "had its intended effect.  All aspects of Plaintiffs' lives have been altered as a result of Defendant's actions, including such simple things as where to live, how they go out in public, and when to see family and friends." Nathan Decl. Ex. B ¶ 183.

134.    Mr. Giuliani's conduct was "malicious, wanton, and intentional," and "Defendant Giuliani's wrongful conduct . . . was calculated to cause harm to Ms. Freeman and Ms. Moss." *Id.* ¶¶ 179, 181.

135.    Mr. Giuliani made statements about Ms. Freeman and Ms. Moss without "applicable privilege or legal authorization" and "carried out his campaign with actual malice." *Id.* ¶¶ 173, 180.

136.    In inflicting emotional-distress damages on Plaintiffs, Mr. Giuliani acted with "willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care" and he "***specifically intended*** to cause Ms. Freeman and Ms. Moss harm." *Id.* ¶ 182 (emphasis added).

137.    Mr. Giuliani's "wrongful conduct has inflicted severe emotional distress on Plaintiffs. . . . The emotional distress Defendant caused to be inflicted on Ms. Freeman and Ms. Moss was so severe that no reasonable person could be expected to endure it." *Id.* ¶ 184.

138.    Mr. Giuliani's "wrongful conduct caused physical manifestations of harm to Plaintiffs including weight gain, disrupted sleep, dental problems, and anxiety attacks, as well as mental anguish, requiring them to seek treatment for the mental anguish resulting directly from the severe emotional trauma inflicted by Defendant." *Id.* ¶ 185.

139.    Enlisting other individuals to further defame Ms. Freeman and Ms. Moss, Mr. Giuliani "agreed to intentionally and maliciously participate in a civil conspiracy with other individuals, the purpose of which was to commit the torts of Defamation, Defamation *Per Se*, and Intentional Infliction of Emotional Distress." Nathan Decl. Ex. B ¶ 188.

140.    As to each claim raised by Ms. Freeman and Ms. Moss, Mr. Giuliani "***specifically intended*** to cause Ms. Freeman and Ms. Moss harm[.]" *Id.* ¶¶ 182–83 (emphasis added); *see also id.* ¶¶ 175, 181, 188, 190.

141.    Mr. Giuliani "continued to repeat and republish the false defamatory statements throughout 2021 and into 2022, including after Plaintiffs initiated [the] action." *Id.* ¶ 12. His malicious lies about Ms. Freeman and Ms. Moss continued for years, even after Plaintiffs sent him

a retraction demand on December 16, 2021, and after the Freeman Litigation was initiated on December 23, 2021. *Id.* ¶¶ 12, 98, 121–122.  Mr. Giuliani "has not retracted any of his statements about Plaintiffs." *Id.* ¶ 122.

142.   On December 11, 2023, trial on the damages owed by Mr. Giuliani commenced in District Court.  Nathan Decl. Ex. A at 34 (Dec. 11, 2023 Min. Order).

143.   The jury instructions were read to the jury on December 14, 2023, where the Court ordered that the jury make certain findings on matters already decided: "certain matters have already been decided in this case. . . . You are not being asked to, and you must not, reconsider any of the issues that have already been decided[.]" *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 18, 2023), ECF No. 137 at 4; Nathan Decl. Ex. K at 4.[4]

144.   In explaining why the jury must make certain findings on issues already decided, the Court stated that it had "found that Mr. Giuliani willfully refused to comply with his discovery obligations" and that his "willful refusal to comply with his discovery obligations caused the plaintiffs 'prejudice,' which means that it harmed their ability to prove their claims."  *Id.* at 4.

---

[4] In the First Amended Joint Pre Trial Submission filed by Plaintiffs and Mr. Giuliani on December 4, 2023, the parties jointly asked the District Court to explain to the jury that,  "[t]he Court has already determined that Defendant Giuliani is liable for defamation per se, intentional infliction of emotional distress, and conspiracy, and that Ms. Freeman and Ms. Moss are entitled to receive compensation, including in the form of punitive damages, for Defendant Giuliani's willful conduct." *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 4, 2023), ECF No. 115 at 2; Nathan Decl. Ex. P at 2.  Similarly, joint proposed jury instructions submitted by Plaintiffs and Mr. Giuliani provided that "[i]t . . . has been decided that Defendant Giuliani's conduct was willful," and "[t]he Court's finding that Defendant Giuliani made the Actionable Statements 'without privilege to a third party' means that he did not have a separate legal right to make them." *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Nov. 14, 2023), ECF No. 105-4 at 3, 4; Nathan Decl. Ex. Q at 3, 4.

E.   **After Trial, the Jury Awards Over $148 Million in Damages and the District Court Enters Final Judgment.**

145.   On December 15, 2023, a jury awarded Plaintiffs $148,169,000.00 in damages resulting from Mr. Giuliani's conduct, including (a) a total of $33,169,000 in compensatory damages for defamation; (b) a total of $40 million in compensatory damages for intentional infliction of emotional distress; and (c) a total of $75 million in punitive damages. *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 15, 2023), ECF No. 135; Nathan Decl. Ex. L.

146.   On December 18, 2023, following the submission of a Joint Stipulation filed by Plaintiffs and Mr. Giuliani, the District Court entered final judgment against Mr. Giuliani and the following declaratory relief:

(a) It is hereby DECLARED (1) that the Actionable Statements set forth in the Amended Complaint, ECF No. 22, are false; (2) that those statements are defamatory and defamatory *per se*; (3) that those statements were of and concerning plaintiffs; (4) that defendant made those statements ***with actual malice***; (5) that defendant published those statements to third parties without privilege; and (6) that those statements caused plaintiffs harm;

(b) It is further DECLARED (1) that defendant Giuliani engaged in extreme and outrageous conduct which (2) ***intentionally and maliciously*** (3) caused the plaintiffs to suffer severe emotional distress;

(c) It is further DECLARED (1) that defendant Giuliani entered into an agreement on or before December 3, 2020, with Donald J. Trump, Christina Bobb, Herring Networks, Inc., d/b/a OAN, Robert Herring, Charles Herring, Chanel Rion, and members of the Trump 2020 Presidential Campaign, including members of the Trump Legal team headed by Giuliani, who caused statements to be published about plaintiffs or participated in such publications, (2) to participate in defamation of and intentional infliction of emotional distress on plaintiffs, and (3) that plaintiffs were injured by unlawful overt acts performed by parties to the agreement pursuant to, and in furtherance of, the common scheme.

(d) It is further DECLARED that defendant's conduct was ***intentional, malicious, wanton, and willful***, such that plaintiffs are entitled to punitive damages.[5]

---

[5] The final judgment also reduced the amount of compensatory damages awarded to Plaintiffs to $70,969,000, based on an agreement between Plaintiffs and Mr. Giuliani. Nathan Decl. Ex. M at ¶ 1; Nathan Decl. Ex. N at 1.

*Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 18, 2023), ECF No. 138 at 2–3; Nathan Decl.

Ex. M at 2–3; *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 18, 2023), ECF No. 142 at 2–3;

Nathan Decl. Ex. N at 2–3 (emphasis added).

147.    On December 20, 2023, the District Court granted Plaintiffs' motion for leave to

register the final judgment in any district of the United States, and dissolved Rule 62(a)'s automatic

stay of execution. *Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. Dec. 20, 2023), ECF No. 144.

148.    Mr. Giuliani filed a Chapter 11 petition on December 21, 2023. *In re Giuliani*, No.

23-12055 (SHL) (Bankr. S.D.N.Y. Dec. 20, 2023), ECF No. 1.

Respectfully submitted,

Dated: April 5, 2024                    /s/ Rachel C. Strickland

Michael J. Gottlieb                     Rachel C. Strickland
Meryl Governski (admitted *pro hac vice*)   Aaron E. Nathan
WILLKIE FARR & GALLAGHER LLP             James H. Burbage
1875 K Street NW                        M. Annie Houghton-Larsen
Washington, DC 20006                    WILLKIE FARR & GALLAGHER LLP
                                        787 Seventh Avenue
Von A. DuBose (*pro hac vice* forthcoming)  New York, NY 10019
DUBOSE MILLER LLC                       Telephone: (212) 728-8000
75 14th Street NE                       rstrickland@willkie.com
Suite 2110
Atlanta, GA 30309                       Rachel Goodman
Telephone: (404) 720-8111               John Langford
                                        UNITED TO PROTECT DEMOCRACY
                                        82 Nassau Street, #601
                                        New York, NY 10038
                                        Telephone: (202) 579-4582

                                        *Counsel for Plaintiffs*